## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KIMBERLY ANN BRININGER,** | : | **Civil No. 3:16-CV-00903** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | **(Chief Magistrate Judge Schwab)** |
| **NANCY A. BERRYHILL**[1] | : | |
| **ACTING COMMISSIONER** | : | |
| **OF SOCIAL SECURITY** | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.      Introduction.

Plaintiff Kimberly Ann Brininger, an adult individual who resides within the

Middle District of Pennsylvania, seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying her claim for

Supplemental Security Income under Title XVI of the Social Security Act.

Jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 1383(c)(3)

(incorporating 42 U.S.C. § 405(g) by reference).

This matter has been referred to the undersigned United States Magistrate

Judge to prepare a report and recommended disposition pursuant to the provisions

of 28 U.S.C. §636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.  For

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C.
§405(g), Acting Commissioner Nancy A. Berryhill is automatically substituted as
the named defendant in place of the former Commissioner of Social Security.

the reasons expressed herein, the final decision of the Commissioner of Social Security is supported by substantial evidence. Accordingly, we recommend that the Court affirm the final decision of the Commissioner denying Ms. Brininger's claim.

## II. Procedural History.

On January 15, 2013, Ms. Brininger filed an application for supplemental security income benefits. *Admin. Tr.* at 101. She worked as an in-home aid to the elderly until July 9, 2012, when the client she was caring for went into the hospital. *Id*. at 128 & 163. Although she asserted that her disability began on April 19, 2008, she asserted that her condition became severe enough to keep her from working on July 9, 2012. *Id*. at 101 & 128. She listed the following conditions as limiting her ability to work: Huntington 's chorea Disease, bipolar, weakness of the left side, and memory loss. *Id*. at 128.

After the Commissioner denied Ms. Brininger's claim at the initial level of administrative review, Ms. Brininger requested an administrative hearing. *Id*. at 90-91. On September 23, 2014, with the assistance of counsel, she testified at a hearing before Administrative Law Judge (ALJ) Edward L. Brady. *Id*. at 34-65.

Determining that Ms. Brininger was not disabled within the meaning of the Social Security Act from January 10, 2013, the date she filed her application, the ALJ denied Ms. Brininger's application for benefits. *Id*. at 16-33. Ms. Brininger appealed the ALJ's decision to the Appeals Counsel, which denied her request for review on April 7, 2016. *Id*. at 1-6. This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

On May 17, 2016, Ms. Brininger initiated this action by filing a complaint in this Court claiming that the ALJ's decision that she did not meet or equal Listing 11.17 and that there are jobs that exist in significant numbers in the national economy that she can perform is not supported by substantial evidence. *Doc. 1*. On July 19, 2016, the Commissioner filed an answer and a certified transcript of the administrative proceedings. *Docs. 10 & 11*. This matter has been briefed by the parties and is ripe for decision. *Docs. 12 & 16*.

## III. Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198,

200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Ms. Brininger was disabled, but whether the Commissioner's finding that she was not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014

4

WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §416.905(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. §416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §§416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. §416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents

him or her in engaging in any of his or her past relevant work. 42 U.S.C.

§ 1382c(a)(3)(H)(i) (incorporating 42 U.S.C. § 423(d)(5) by reference); 20 C.F.R.

§ 416.912;[2] *Mason*, 994 F.2d at 1064.  Once the claimant meets this burden, the

burden shifts to the Commissioner at step five to show that jobs exist in significant

number in the national economy that the claimant could perform that are consistent

with the claimant's age, education, work experience, and RFC. 20 C.F.R.

§416.912(f); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive

requisites.  Most significant among these legal benchmarks is a requirement that

the ALJ adequately explain the legal and factual basis for this disability

determination.  Thus, in order to facilitate review of the decision under the

substantial evidence standard, the ALJ's decision must be accompanied by "a clear

and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642

F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the

ALJ must indicate which evidence was accepted, which evidence was rejected, and

---

[2]  20 C.F.R. §416.912 was amended after the ALJ issued his decision in this case.
Subsection (f) of the version in effect on the date of the ALJ's decision was
redesignated as section (b)(3) in the most recent version of 20 C.F.R. §416.912.
We cite to the version of this regulation that was effective on the date of the ALJ's
decision, but the outcome in this case would be the same under the more recent
version of this regulation.

the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

## IV. Medical History and Testimony.

### A. Relevant Medical History.

There is a strong family history of Huntington's disease in Ms. Brininger's family, and she had a positive gene test for Huntington's disease. *Admin. Tr.* at 189. But in February of 2010, Dr. Subramanian of the Hershey Medical Center noted that although Ms. Brininger has a severe anxiety disorder and depression arising from the positive gene test, clinically she did not have any "symptomatology or findings that are consistent with either Huntington chorea or [the] juvenile form of Huntington chorea or any other neurological disease" at that time. *Id.* Ms. Brininger complained of "some cognitive problems and some occasional clumsiness of her left hand," but Dr. Subramanian concluded that her symptoms were related to her anxiety and he continued her on Lexapro for her anxiety. *Id.*

Medical records from the Lock Haven Hospital show that between March of 2010 and November of 2012, Ms. Brininger made five trips to the emergency room: twice for back pain (once after she fell on the bleachers at the races); once for swelling of her lower left leg after she received a shot in that leg the day before for a varicose vein and she was diagnosed with a small ecchymosis; once for cold symptoms when she was diagnosed with acute bronchitis; and once after she was assaulted. *Id.* at 198-215. These records do not contain any notations regarding any neurological or other serious ongoing conditions. *Id.*

Also before the ALJ were records from Clinton Medical Associates, Ltd. *Id.* at 216-276 & 295-304. Of note, is a letter dated November 26, 2007, from Barbara M. Buckley, PA-C. *Id.* at 295. This letter, addressed to "To Whom It May Concern," states that Dr. Yanofsky, a neurological specialist, diagnosed Ms. Brininger with Huntington chorea and indicated to Clinton Medical Associates that she is disabled and will never be able to work. *Id.*

Also of note is a document from May of 2009, signed by Buckley and Dr. Michael Greenberg, which in response to a directive to check any that apply to the patient, has check marks next to: "Present of HD gene"; "Balance problems"; "Legs 'buckle' and 'give out'"; "Gait problems"; "Memory Loss"; "Concentration problems"; "Muscle weakness and fatigue"; "General fatigue"; "Depression";

9

"Loss of interest in activities"; "Irritability"; and "Limitation of coping skills." *Id.* at 296. Buckley and Greenberg answered "yes" to the question asking whether Ms. Brininger suffers "from significant reproducible fatigue of motor function with substantial muscle function weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be consistent with Huntington Chorea Disease." *Id.* They answered "no" to the question asking whether Ms. Brininger suffers "from pareses, paralysis or tremors or other involuntary movements[,] ataxia and sensory disturbances [text unreadable] interference with use of extremities such as fingers, hands, arms and legs" *Id.* They opined that Ms. Brininger would need the following accommodations if hired for a job: the "ability to come in late and leave early"; "frequent absences"; and "extra and/or breaks." *Id.* at 297. They further opined that her conditions impair her ability to sustain full-time employment on a regular basis. *Id.* They asserted that in general she can work less than two to three hours a day "but restricted, this can vary & change"; that the time she can stand at one time can also vary but the average is 30 to 60 minutes; that she can stand less than one hour in a work day; and that she cannot lift any weight on either an occasional or frequent basis. *Id.* They concluded that in their opinion, Ms. Brininger has been disabled since on or before November 26, 2007. *Id.*

In March of 2013, David Smock, Ph.D. evaluated Ms. Brininger and prepared a consultative evaluation report. *Id*. at 277-293. After setting forth Ms. Brininger's background and symptoms as reported by her, Dr. Smock noted that her attention and concentration were impaired. *Id*. at 287. He stated that although her recent memory was "fairly good," her remote memory showed some impairment. *Id*. Dr. Smock felt that she had extreme limitations in understanding, remembering, and carrying out short, simple instructions; understanding and remembering detailed instructions; making judgments on simple work-related decisions; interacting appropriately with the public, supervisors, and co-workers; and responding appropriately to work pressures and changes in a work setting. *Id*. at 281.

In a July 2013 progress note, Dr. David Schreiber of Susquehanna Health noted Ms. Brininger's diagnosis of Huntington Disease and that "[s]he still has very mild problems with left arm weakness and some mild abnormal movements of her right leg. This is little changed in many years. She also has some mild memory complaints." *Id*. at 305. Dr. Schreiber noted that on physical examination, Ms. Brininger has "[s]ome collapsing weakness of [her] right arm," that her balance, gait, and coordination were intact, that her fine motor skills were normal, that her deep tendon reflexes were "preserved and symmetric," that her Babinski

reflexes were normal, that she was negative for "Kernig's sign" or "Brudzinski's sign," and that he saw no abnormal movements. *Id*. at 306. Dr. Schreiber concluded that he found "no memory deficit," and that Ms. Brininger had "no abnormal movements on exam and will not Rx at this time." *Id*. at 307. Given her left arm weakness, he ordered an "MRI to define if any focal lesion is seen a[s] an etiology," and he ordered a follow-up in four weeks. *Id*.

In a February 2014 progress note from a follow-up visit to Susquehanna Health, Dr. Donald Dworek noted that for financial reasons, Ms. Brininger was unable to get the MRI that Dr. Schreiber had ordered. *Id*. at 308. With respect to his neurological examination, Dr. Dworek commented:

> No nystagmus, No pronator drifts, POSITIVE b/l Hoffman signs, Negative Romberg, Abnormal Tandem walk was unable to keep balance; normal finger to nose testing and normal HTS testing without ataxia; gait appeared normal; no troubles with turning; no abnormal movements; no tremors; no chorea; give away strength noted; symmetric strength; no pronator drifts.

*Id*. at 311. He ordered blood tests, an MRI, and prescribed valproic acid and mirtazapine. *Id*. He also referred Ms. Brininger to a psychiatrist as well as ordering a follow up appointment in five weeks. *Id*.

In May of 2013, Dr. Sultana Begum of Universal Community Behavioral Health performed a psychiatric evaluation of Ms. Brininger, and noted in

connection with a cognitive examination, that Ms. Brininger's long-term memory was intact, but her short-term memory was impaired. *Id*. at 321. Dr. Begum diagnosed Ms. Brininger with "Major Depressive Disorder, Recurrent, Moderate, Without Psychosis" and "Adjustment Disorder, With Depressed Mood." *Id*. Dr. Begum recommended that Ms. Brininger continue the Lexapro and mirtazapine and that she continue therapy and work with her primary care physician regarding her Huntington's disease. *Id*. at 322.

Dr. Begum saw Ms. Brininger again in July of 2013, noting that she reported increased depression. *Id*. at 317. Dr. Begum increased the dosage of Lexapro, continued the Remeron, and added Abilify. *Id*. at 318. Ms. Brininger was advised to return to the clinic in three months. *Id*. But it does not appear that Ms. Brininger followed up, and a form dated April of 2014, notes that Ms. Brininger was discharged from Universal Community Behavioral Health's Medication Clinic because she was non-compliant. *Id*. at 313.

## B. Testimony at the Hearing Before the ALJ.

 A hearing before the ALJ occurred on September 23, 2014. Two witnesses testified at the hearing—Ms. Brininger and vocational expert (VE) Nadine Henzes.

### 1. Ms. Brininger's Testimony.

Ms. Brininger testified that she resides with her boyfriend and that her son, who was under 18 at the time of the hearing, stayed with her sometimes. *Admin. Tr.* at 42-43. She last worked in 2012, but that job ended when the woman that she was assisting went into a home. *Id*. at 57.

Ms. Brininger testified that her Huntington's disease causes her balance issues; she cannot walk in a straight line and she has fallen because of her balance issues. *Id*. at 50. According to Ms. Brininger, the month before the hearing, she fell while "just walking." *Id*. at 51. In addition, Ms. Brininger testified that she cannot lift at all on her left side; for example, if she would try to pick up a coffee cup with her left hand, she would "just drop it." *Id*. She also testified that she has weakness in her left leg, and it goes out and she falls. *Id*. at 59-60. According to Ms. Brininger, she recently began having problems with her right side as well. *Id*. at 55.

Ms. Brininger testified that she experiences both general anxiety and panic attacks. *Id*. at 45. Although she takes Abilify, she testified that it does not really help. *Id*. at 45-46. She is nervous "[m]ostly every day," and she copes by smoking cigarettes. *Id*. at 47. She also testified that she sleeps "most of the time." *Id*. She sleeps 12 hours, including daytime naps (some as long as six hours) out of a 24-

hour period. *Id*. at 48 & 58.  She testified that she is sad and depressed and that some days are better or worse than others. *Id*. at 49.  And when she is sad and depressed she gets mad and angry. *Id*. at 50.  Ms. Brininger also testified that she has memory problems. *Id*. at 57.  When asked what issues she has noticed with her memory, she testified: "Where you tell me something that I remember and after we're done, I won't remember what you said." *Id*.

Ms. Brininger testified that she can sit for no more than two hours before she has to change position, she can stand for only two hours, and she can lift less than five pounds. *Id*. at 54-55.  Although she does a small load of laundry every day and she does the dishes, according to Ms. Brininger, she is not really able to help with the household chores. *Id*. at 56.  When asked "Who does the cooking in the house?" she testified "I - - he does." *Id*.  She can take care of herself—getting dressed, showering, and those kinds of things. *Id*.  Although she used to go shopping, bowling, and walking, she testified that does not really do any of those things anymore, and, in fact, she does not get out of the house very much. *Id*. at 59.  She testified that she used to be able to walk two to three miles, but now she can walk less than a half of a mile. *Id*.  When awake, she goes outside and sits, and she watches TV. *Id*.  She had not driven since the year before the hearing because her car's engine went out. *Id*. at 48-49.

Ms. Brininger testified about the medications that she takes: she uses two inhalers for COPD, and she takes Lexapro, Abilify, hydrocodone (for back pain from rheumatoid arthritis and Scoliosis), escitalopram, montelukast, and valproic acid. *Id*. at 52-53. According to Ms. Brininger, the medications do not really help. *Id*. at 54.

As to her discharge from Universal Community Behavioral Health, Ms. Brininger explained that she was not compliant because she did not have insurance. *Id*. at 43. She testified, however, that as of December of 2013, she had obtained insurance. *Id*. When asked why she did not return to Universal Community Behavioral Health after she again had insurance, she explained that she had no transportation at that time. *Id*. at 44. She testified that although in the past she has forgotten to take her medications and forgotten doctor appointments, it is not her conscious effort not to do those things; she just forgets. *Id*. at 60.

After Ms. Brininger finished testifying, the ALJ stated that he was going to send her for a neurological consultative evaluation since it had been some time since she had a neurological evaluation. *Id*. at 60-61. Before ending the hearing, however, the ALJ asked the vocational expert who was present some questions.

### 2.  VE Henzes's Testimony.

After VE Henzes described Ms. Brininger's past work as a cashier and as a home health aide, the ALJ asked her whether a hypothetical individual who is the same age as Ms. Brininger, who has the same education and experience as Ms. Brininger, and who could do only a limited range of light duty work with certain limitations could perform any of the work the Ms. Brininger had performed in the past. *Admin. Tr.* at 61-62.  VE Henzes testified that such a hypothetical individual could not perform any of Ms. Brininger's former jobs as she had performed those jobs, but such an individual could perform the job of a cashier, as generally performed, as well as an office helper and a folder. *Id*. at 63.  VE Henzes also testified that an employer would not tolerate an individual who was off task up to 20% of the time at unpredictable intervals. *Id*.

### C.  The Consultative Examination and Report of Dr. Magurno.

In November of 2014, Dr. Justine Magurno performed a consultative neurological examination of Ms. Brininger and submitted a report of that examination.  In the section of the report titled activities of daily living, Dr. Magurno recorded that Ms. Brininger lives with her boyfriend, watches TV, and listens to the radio as well as "cooks twice a week," "cleans, does laundry, and

shops once a week." *Admin. Tr.* at 325.  Dr. Magurno recorded her impressions

regarding Ms. Brininger gait and station:

> Gait appears unsteady with markedly diminished stride
> length.  She declined trying to hop.  Station normal.  She can
> stand on heels and toes.  Used no assistive device.  The
> claimant is unable to tandem walk as she touches the wall for
> support.  Romberg test negative.  Needed no help changing for
> exam or getting on and off the exam table.  Able to rise from
> chair without difficulty.

*Id*.  And she noted that Ms. Brininger's hand and finger dexterity was intact, her

grip strength on the right was 5/5 and on the left 4/5, and she can tie a bow

normally. *Id*. at 326.  As to upper extremities, Dr. Magurno noted: "Strength 5/5 in

proximal and distal muscles except left distal 4/5.  DTRs physiological and equal.

Muscle tone normal.  Finger-to-nose testing was done very slowly and

inconsistently.  Rapid alternating movements normal.  No tremors.  No muscle

atrophy." *Id*.  And as to lower extremities, she noted: "Strength 5/5 right lower

extremity proximal and distal.  Left proximal 4/5 and distal foot dorsiflexion 4/5

and foot plantar flexion 5/5.  DTRs physiological and equal.  Muscle tone normal.

Heel-to-shin testing normal.  Babinski reflexes negative.  No tremors.  No muscle

atrophy." *Id*.  Dr. Magurno recorded that following as to Ms. Brininger's sensory

exam:

> Sensory testing to pin-dull discrimination absent to above
> the knee on the left.  Right lower extremity intact; absent to the

18

> proximal forearm on the right and to the elbow on the left.
> Sensory to light touch testing absent to the mid metatarsal on
> the right and to above the knee on the left. Proprioception
> intact. Vibratory sense unable to test.

*Id*. Dr. Magurno also noted that Ms. Brininger had some decreased range of motion of the lumbar spine. *Id*. at 335.

Dr. Magurno diagnosed Ms. Brininger with "Huntington's disease by history," asthma, history of bipolar disorder, and tobacco abuse, and she indicated that Ms. Brininger's prognosis was "fair." *Id*. at 326

Dr. Magurno also completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)." *Id*. at 328-333. Citing Ms. Brininger's poor balance, Dr. Magurno checked boxes indicating that Ms. Brininger could continuously lift and carry up to ten pounds, but she could never lift or carry more than ten pounds. *Id*. at 328. And she indicated that Ms. Brininger could sit for eight hours at a time, stand for one hour at a time, and walk for 15 minutes at a time, and, in an eight-hour workday, she could sit for eight hours, stand for four hours, and walk for 90 minutes. *Id*. at 329. She further checked boxes indicating that Ms. Brininger requires the use of a cane to ambulate, that use of a cane is medically necessary, and that with the cane, Ms. Brininger can use her free hand to carry small objects. *Id*. She also stated that Ms. Brininger can walk for 50 feet without the use of a cane. *Id*. Contrary to the directive on the form, however, Dr.

Magurno did not identify any medical or clinical findings that supported her assessment of the limitations, and why those findings support that assessment, as to sitting, standing, and walking. *Id*.

As to use of hands, Dr. Magurno checked boxes indicating that Ms. Brininger, who is right-hand dominant, could continuously reach (overhead and all other) with both her right and left hands, that she could continuously handle, finger, and push/pull with her right hand, frequently feel with her right hand, and frequently handle, feel, and push/pull with her left hand. *Id*. at 330. Dr. Magurno did not check any box with regard to fingering with the left hand. *Id*. In response to the directive to identify particular medical or clinical findings that supported her assessment or any limitations and to why those findings support that assessment, Dr. Magurno wrote "weak L" and "↓ sensation bil." *Id*.

Citing "↓sensation bil" and "↓ strength L," Dr. Magurno checked boxes indicating that Ms. Brininger could frequently operate foot controls with her right foot, but she could do so only occasionally with her left foot. *Id*. Further citing that Ms. Brininger is unable to tandem walk, "L weak," and "↓ ROM spine," Dr. Magurno checked boxes indicating that Ms. Brininger could frequently stoop but that she could never climb stairs and ramps, climb ladders or scaffolds, balance, kneel, crouch, or crawl. *Id*. at 331.

Dr. Magurno concluded that Ms. Brininger could tolerate very loud noises, continuously operate a motor vehicle, and tolerate exposure to humidity, wetness, and vibrations. *Id.* at 332. But citing Ms. Brininger's asthma, her weakness on the left side, and her inability to tandem walk, Dr. Magurno concluded that Ms. Brininger could never tolerate extreme cold, extreme heat, dust, orders, fumes, or pulmonary irritants; and she could never work at unprotected heights or with moving mechanical parts. *Id.*

Dr. Magurno asserted that Ms. Brininger could shop; travel without a companion for assistance; walk without a wheelchair, two canes, or two crutches; prepare simple meals and feed herself; care for her personal hygiene; and sort, handle, and use paper/files. *Id.* at 333. But citing Ms. Brininger's weakness on the left side, Dr. Magurno concluded that Ms. Brininger cannot walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, or climb a few steps at a reasonable pace with the use of a single handrail. *Id.* Dr. Magurno concluded that the limitations she identified have lasted or will last for 12 consecutive months. *Id.*

Ms. Brininger's counsel responded to Dr. Magurno's report by arguing that the report shows that Ms. Brininger cannot perform the light jobs identified by the

VE at the hearing and that Ms. Brininger meets the requirements of Listing 11.17. *Id*. at 167-169.

### D. Supplemental Questions to and Responses by VE Henzes.

After receiving Dr. Magurno's report, the ALJ submitted written interrogatories to VE Henzes, which she responded to in writing. Of relevance here, the ALJ asked VE Henzes if a hypothetical individual of the same age as Ms. Brininger and with her same education and work experience could perform any of Ms. Brininger's past jobs assuming that the hypothetical individual had the RFC to perform sedentary work with the following limitations:

- she can stand only four hours in an eight-hour day;
- she requires a cane to ambulate;
- she can tolerate up to frequent bilateral handling, fingering, feeling, pushing, and pulling;
- she can tolerate up to frequent bilateral use of the lower extremities for foot controls;
- she cannot climb ladders, ropes, scaffold, stairs, or ramps;
- she cannot balance;
- she can frequently stoop;
- she cannot kneel, crouch, or crawl;
- she must avoid unprotected heights;
- she must avoid dangerous conditions and machinery;
- she must avoid fumes, odors, dusts, gasses, and extreme temperatures; and
- she can only work at jobs that:
  - are simple, routine, and repetitive;
  - are unskilled;
  - involve low stress;

> •involve no production-rate or pace requirements; and
> •involve only occasional work with people.

*Admin. Tr.* at 171.  VE Henzes answered "No" to that question. *Id*.  But she

responded that such a hypothetical individual could perform unskilled occupations

with jobs that exist in the national economy, and she identified that following such

jobs, the Dictionary of Occupational Titles (DOT) codes for those jobs, and the

number of such jobs nationally:

> • Document preparer—DOT 249.587-018—125,000 jobs
>   nationally;
> • Label cutter—DOT 585.685-062—64,465 jobs
>   nationally; and
> • Surveillance System Monitor—DOT 379.367-010—
>   74,470 jobs nationally.

*Id*. at 172.  VE Henzes asserted that there was no conflict between the above and

the occupational information contained in the DOT. *Id*. at 173.

Ms. Brininger's counsel responded to VE Henzes's responses to the

interrogatories by arguing: that the document preparer job—titled "Document

Preparer, Microfilming" in the DOT—has been replaced by computer applications

and processes since that job description was last updated in the DOT 28 years ago;

that the label cutter job—titled "Label Pinker" in the DOT—requires use of a

pinking or cutting machine, which would conflict with Dr. Magurno's limitation

that Ms. Brininger never be around moving mechanical parts; and that the

remaining job identified by the VE—surveillance-system monitor—"is insufficient to overcome the presumption of disability that is raised by the fact that [Ms. Brininger] is unable to return to [her] prior employment." *Id*. at 179-180.

## V.  The ALJ's Decision Denying Ms. Brininger's Claim.

On February 27, 2015, the ALJ denied Ms. Brininger's claim for benefits. Applying the sequential-evaluation process, the ALJ determined that Ms. Brininger was not disabled within the meaning of the Social Security Act.

At step one of the sequential-evaluation process, the ALJ found that Ms. Brininger had not engaged in substantial gainful activity since she filed her application for benefits on January 10, 2013. *Admin. Tr.* at 18.

At step two of the sequential-evaluation process, the ALJ found that Ms. Brininger had the following severe impairments: Huntington's disease, Major depressive disorder, and panic attacks and anxiety. *Id*. at 18-19.  Although Ms. Brininger advised a consultative examiner that she had been diagnosed with asthma, the ALJ noted that there was no conclusive diagnosis or ongoing treatment for asthma. *Id*. at 19.  He also noted that although an esophagogastroduodenoscopy performed in January of 2010, noted gastritis and moderately severe esophagitis, Ms. Brininger has not received any ongoing treatment for those conditions, and

there was no evidence of any objective deficits correlated or attributed to those conditions. *Id.* Finding no evidence in the record that Ms. Brininger's asthma, gastritis, and esophagitis either met the durational requirements of the program or created any functional limitations regarding Ms. Brininger's ability to perform work-related activities, the ALJ concluded that those impairments were not severe. *Id.*

At step three of the sequential-evaluation process, the ALJ found that Ms. Brininger did not have any impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 14. More specifically, the ALJ discussed Listings 11.17, 12.04, and 12.06 and determined that Ms. Brininger did not meet those Listings. *Id.* at 19-21.

Between steps three and four of the sequential-evaluation process, the ALJ assessed Ms. Brininger's RFC. He found that Ms. Brininger had the RFC to perform less than the full range of sedentary work, see 20 C.F.R. § 416.967(a) (defining sedentary work),[3] with the limitations he had posited to the VE after Dr. Magurno's report.

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 416.967. "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out

At step four of the sequential-evaluation process, the ALJ found that given Ms. Brininger's RFC, she was not capable of performing her past relevant work as a cashier or a nurse's aide. *Id.* at 28.

Finally, considering Ms. Brininger's age, education, work experience, and RFC, the ALJ found at step five that there were other jobs—such as document preparer, label cutter, and surveillance system monitor—that exist in significant numbers in the national economy that Ms. Brininger could perform. *Id.* at 29-30. Accordingly, the ALJ concluded that Ms. Brininger was not disabled.

## VI. Discussion.

### A. The ALJ's assessment that Ms. Brininger did not meet the criteria of Listing 11.17 is supported by substantial evidence.

Ms. Brininger argues that the ALJ erred in finding that she did not meet or equal Listing 11.17.

Appendix 1 of 20 C.F.R. Part 404, Subpart P ("listing of impairments"), describes, for each major body system, the severity of impairment that is considered to be severe enough to prevent a claimant from doing any gainful activity regardless of the claimant's age, education, or work experience. 20 C.F.R. §404.1525(a); 20 C.F.R. §404.925(a). At step three of the sequential evaluation

job duties." *Id.* "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

26

process, the ALJ considers whether the combination of the claimant's medically determinable impairments meets the severity of one of the impairments in the listing of impairments. 20 C.F.R. §404.1520(a)(4)(iii); 20 C.F.R. §416.920(a)(4)(iii). If a claimant has an impairment that meets the twelve-month duration requirement, and meets or equals all the criteria of an impairment in the listing of impairments, the claimant is found disabled. 20 C.F.R. §404.1520(a)(4)(iii); 20 C.F.R. §416.920(a)(4)(iii).

To qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, the claimant bears the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. *Id.*

The ALJ considered Ms. Brininger's impairments under Listing 11.17 of 20 C.F.R. Part 404, Subpart P, Appendix, which addresses the evaluation of neurological disorders. Specifically, at the time of the ALJ's decision,[4] Listing 11.17, which covers "[d]egenerative disease not listed elsewhere, such as

---

[4] This listing was amended in 2017, but we apply the listing in effect on the date of the ALJ's decision.

Huntington's chorea, Friedreich's ataxia, and spino-cerebellar degeneration," required: "A. Disorganization of motor function as described in 11:04B."[5] 11.04B, in turn, required "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." 11.00C provided:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

The ALJ concluded that Ms. Brininger does not satisfy Listing 11.17.[6] He found that Ms. Brininger's impairments did "not satisfy the requisite neurological, laboratory, clinical and/or diagnostic requirements for listing level severity."

---

[5] In the alternative, 11.17 required "B. Chronic brain syndrome." Here, Ms. Brininger does contend that she met the listing through Requirement B—chronic brain syndrome. Thus, we limit our consideration to Requirement A— disorganization of motor function.

[6] The ALJ also concluded that Ms. Brininger did not meet Listing 12.04 or 12.06. As Ms. Brininger does not argue here that the ALJ erred in that regard, we do not consider those listings.

*Admin. Tr.* at 19.  Specifically, he found "no indication of disorganization of motor

function as described in 11.04B":

> The evidence does not indicate significant and persistent
> disorganization of motor functions in two extremities, resulting
> in sustained disturbance of gross and dexterous movements, or
> gait and station.  Although the evidence indicates claimant
> having difficulty with tandem walking and using wall for
> support, she uses a cane for ambulation and this has been
> provided for in the residential functional capacity.  However,
> such difficulties do not establish significant and persistent
> disorganization of motor function.  She does not demonstrate
> sustained disturbance of gross and dexterous movements, or
> gait and station with the degree of interference indicative of
> listing level severity.

*Id.*

Ms. Brininger contends that the Dr. Magurno's report and medical source

statement show that she meets Listing 11.17.  More specifically, she contends that

Dr. Magurno's report leads "undeniably to a conclusion that [she] has

Huntington's Chorea to the extent that she has significant and persistent

disorganization of motor function in her lower extremities resulting in sustained

disturbance of gait and station." *Doc. 12* at 6.  While Dr. Magurno's report shows

that Ms. Brininger has some problems with motor functions, we cannot say that the

ALJ's conclusion that the evidence does not "establish significant and persistent

disorganization of motor function," arising to listing level severity, *Admin. Tr.* at

19, is not supported by substantial evidence.

29

Because Ms. Brininger contends that she meets the Listing because of "significant and persistent disorganization of motor function in her lower extremities resulting in sustained disturbance of gait and station," *doc. 12* at 6, we repeat what Dr. Magurno observed in her report regarding gait and station:

> Gait appears unsteady with markedly diminished stride length. She declined trying to hop. Station normal. She can stand on heels and toes. Used no assistive device. The claimant is unable to tandem walk as she touches the wall for support. Romberg test negative. Needed no help changing for exam or getting on and off the exam table. Able to rise from chair without difficulty.

*Admin. Tr.* at 325. And what she reported regarding Ms. Brininger's lower extremities: "Strength 5/5 right lower extremity proximal and distal. Left proximal 4/5 and distal foot dorsiflexion 4/5 and foot plantar flexion 5/5. DTRs physiological and equal. Muscle tone normal. Heel-to-shin testing normal. Babinski reflexes negative. No tremors. No muscle atrophy." *Id*. at 326

In her medical source statement, Dr. Magurno checked boxes indicating that Ms. Brininger has limitations on the amount of time that she can stand (one hour at a time and four hours in an eight-hour work day) and the amount of time that she can walk (15 minutes at a time and 90 minutes in an eight-hour work day); that she requires that use of a cane (but she can walk 50 feet without a cane); that she cannot walk a block at a reasonable pace on rough or uneven surfaces; that she

cannot climb (stairs and ramps, ladders or scaffolds, or a few steps at a reasonable pace with the use of a single hand rail); that she cannot balance, kneel, crouch, or crawl;[7] and that she can operate foot controls with her right foot frequently but only occasionally with her left foot. *Id*. at 329-333.

Although Dr. Magurno's report shows that Ms. Brininger has problems with her gait, it also shows that her station is normal. And while Dr. Magurno's report shows that Ms. Brininger has restrictions because of her Huntington's disease, her report does not establish such "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station" as required by Listing 11.17 that we can say Ms. Brininger has shown that her limitations meet or equal Listing 11.17. In sum, the ALJ appropriately applied the Listing, and the ALJ's finding that Ms. Brininger did not meet Listing 11.17 is supported by substantial evidence.

---

[7] In connection with his determination of Ms. Brininger's RFC, the ALJ gave no weight to the postural limitations set forth by Dr. Magurno because those limitations were "based only upon [Ms. Brininger]'s inability to do tandem walk 'as she touches the wall', and which disregard the other predominately normal exam findings." *Admin. Tr.* at 25. He concluded that the limitations were "not consistent with the other exam findings reflected in the record which are not indicative of any significant focal neuro, motor/sensory deficits." *Id*. As Ms. Brininger is not challenging the ALJ's RFC, we do not address the ALJ's findings in this regard. We note that even accepting the postural limitations set forth by Dr. Magurno, the ALJ's conclusion that Ms. Brininger did not meet Listing 11.17 is supported by substantial evidence.

**B.  The ALJ's determination that Ms. Brininger can perform other jobs that exist in significant numbers in the national economy is supported by substantial evidence.**

The ALJ found that there are jobs that exist in significant numbers in the national economy that Ms. Brininger could perform.

At "step five of the disability inquiry, the Commissioner bears the burden of establishing the existence of jobs in the national economy that an individual with the claimant's impairments is capable of performing." *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014); *see also* 20 C.F.R. § 416.912(f) (effective June 12, 2014, through Apr. 19, 2015) ("In order to determine . . .  that you are able to make an adjustment to other work, we must provide evidence about the existence of work in the national economy that you can do  . . . given your residual functional capacity . . . , age, education, and work experience.").[8]  "To determine what type of work (if any) a particular claimant is capable of performing, the Commissioner uses a variety of sources of information, including the DOT, the SSA's own regulatory policies and definitions (found in the Code of Federal Regulations ("CFR")), and testimony from VEs." *Zirnsak*, 777 F.3d at 616.  Here, the ALJ relied on the VE's responses to his interrogatories.  The VE identified three jobs—document preparer, label cutter, and surveillance system monitor—that exist in significant numbers in

---

[8]  Subsection (f) was redesignated as subsection (b)(3) in the current version of 20 C.F.R. § 416.912.

the national economy that Ms. Brininger could perform. *Admin. Tr.* at 29-30. And

the ALJ relied on the VE's responses in finding that there are jobs that exist in

significant numbers in the national economy that Ms. Brininger could perform. *Id.*

Ms. Brininger contends that the document preparer job as described in the

DOT is outdated as it was last updated 28 years ago and since then "computer

processes have replaced the job title such that you have to be computer literate to

perform that particular job" and the ALJ did not take into consideration whether

Ms. Brininger has the computer literacy to perform that job. *Doc. 12* at 7. The ALJ

rejected Ms. Brininger's argument that this job "is outdated, replaced by computer

applications, and no longer exists":

> The undersigned would note that the document preparer
> description includes document preparation such as brochures,
> pamphlets and catalogs for microfilming; using a paper cutter,
> photocopying machine, rubber stamps and other work devices.
> As such, and contrary to the representative's positions, the
> position is not outdated nor has it been replaced by computer
> applications. The vocational expert by virtue of her citing this
> sample DOT in response to the specific residual functional
> capacity maintains that such positions are available in
> significant numbers. There has been no evidence to the
> contrary that this job no longer exists in the national economy.

*Admin. Tr.* at 29.

Ms. Brininger also argues that the second job identified by the ALJ—the

label cutter job—is not consistent with Dr. Magurno's restriction that she "never

33

be[] around moving and mechanical parts/dangerous machinery" because it "requires the use of a pinking or cutting machine." *Doc. 12* at 8. The ALJ rejected this argument reasoning that the VE was aware of Dr. Magurno's limitation that Ms. Brininger not be around dangerous machinery, but she nevertheless testified that Ms. Brininger could perform this job. *Admin. Tr.* at 29. He also noted that the job description in the DOT states that "the job may involve tending a machine that cuts label[s] *without* pinking and yet be designated a label cutter." *Id.* (italics in original). He concluded that while "the job description indicates that a pinking attachment which cuts strips is part of the machine, there is no indication that such an attachment constitutes dangerous moving machinery." *Id.* at 29-30. He also observed that the DOT does not describe the environment for this job as involving "dangerous moving machinery." *Id.* at 30.

Even assuming for the sake of argument that the document preparer job and the label cutter job do not support the ALJ's conclusion that there are jobs that exist in significant numbers in the national economy that Ms. Brininger could perform, the VE's testimony as to the third job—surveillance system monitor— does support the ALJ's conclusion. Responding to the ALJ's interrogatories, the VE identified 74,470 such jobs nationally. *Id.* at 172.

Unlike with the document preparer job, Ms. Brininger does not argue that the surveillance system monitor job is outdated, and unlike with the label cutter job, Ms. Brininger does not argue that she is not capable of performing the surveillance system monitor job. Rather, as to the surveillance system monitor job, Ms. Brininger complains that the VE provided only "national job numbers and not regional or state numbers sufficient to rebut the presumption of disability in a case such as this where the Claimant is not able to perform prior work activities . . . ." *Doc. 12* at 8.

Ms. Brininger's focus on regional or state jobs is misplaced as the question is whether there is work in the national economy that she can do. *Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009) (observing that "the controlling statutes, federal regulations, and case law all indicate that the proper focus generally must be on jobs in the national, not regional, economy"). The Social Security Act provides that "an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the **national economy**, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job

vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C.A. § 1382c(a)(3)(B) (emphasis added). "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

"The accompanying regulations reiterate that 'work exists in the national economy when it exists in significant numbers either in the region where [the individual lives] or in several other regions of the country.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting 20 C.F.R. § 416.966(a)). The regulations further provide that "[i]t does not matter whether . . . [w]ork exists in the immediate area in which you live." 20 C.F.R. § 416.966(a)(1). *See also* 28 C.F.R. § 416.966(c)(2) (" We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remained unemployed because of . . . "[l]ack of work in your local area."). The regulations further set forth how the Commissioner will determine whether work exists in the national economy:

> (b) How we determine the existence of work. Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered work which exists in the national economy. We will not deny you

36

disability benefits on the basis of the existence of these kinds of jobs.  If work that you can do does not exist in the national economy, we will determine that you are disabled.  However, if work that you can do does exist in the national economy, we will determine that you are not disabled.

20 C.F.R. § 416.966(b).

As stated, the VE testified that there are 74,470 surveillance system monitor jobs in the national economy.[9]  "[T]here is no precise estimate for what constitutes 'significant numbers' of jobs under the Social Security Act." *Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013).  It has been held that testimony from a VE that there are jobs in the national economy numbering in the low thousands that the claimant could perform is not sufficient to show a significant number of jobs in the national economy.  *See Alvarez v. Berryhill*, No. 1:16-CV-00707, 2017 WL 1709400, at *7-8 (M.D. Pa. May 3, 2017) (concluding that testimony from a VE that there were 2,077 chaperone jobs in the national economy that Ms. Alvarez could perform was insufficient for the Commissioner to meet her burden of identifying a significant number of jobs that exist in the national economy); *Leonard v. Heckler*, 582 F. Supp. 389, 391 (M.D. Pa. 1983) (concluding that testimony from a VE that there are 4,000 or 5,000 jobs in national economy that

---

[9]  We do not know how the VE arrived at this number, but as Ms. Brininger does not challenge the VE's testimony that 74,470 such jobs exist nationally, we do not address whether the VE's testimony in that regard was reliable.

Mr. Leonard could perform did not support the conclusion that Mr. Leonard was able to engage in work which existed to any significant degree in the national economy). But, here, the VE's testimony that 74,470 surveillance system monitor jobs exist nationally supports the ALJ's conclusion that work exists in significant numbers in the national economy. *See Young*, 519 F. App'x at 772 ("[T]he testimony from the vocational expert that 20,000 jobs were available in the national economy is sufficient to support a finding that work exists in significant numbers."); *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003) (suggesting that 75,000 surveillance system monitor nationwide represented a significant number of jobs); *Webb v. Colvin*, No. 1:14-CV-00250-TFM, 2015 WL 2401717, at *12 n.6 (W.D. Pa. May 20, 2015) (noting that the Commissioner would be entitled to summary judgment "even if the ALJ had found that Plaintiff was limited in the use of his hands" because "[t]he VE testified that, assuming Plaintiff could only occasionally grasp and finger bilaterally, he could still perform the job of surveillance system monitor, of which there are approximately 25,000 in the national economy" and "Courts have found that 25,000 jobs in the national economy constitutes a 'significant' number").

As noted above, "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where" the claimant lives "are not

considered work which exists in the national economy." 20 C.F.R. § 416.966(b). But "[t]here is nothing in the nature of the job at issue, surveillance monitor, that suggests that these jobs exist in only a few locations." *Brun v. Barnhart*, No. 03-44-B-W, 2004 WL 413305, at *6 (D. Me. Mar. 3, 2004) (report and recommendation of magistrate judge), *adopting Report and Recommendation,* 2004 WL 1572695, at *1 (D. Me. Apr. 5, 2004), *aff'd,* 126 F. App'x 495 (1st Cir. 2005). Or that they exist only outside the region where Ms. Brininger lives. *See Ahmad v. Comm'r of Soc. Sec.*, 531 F. App'x 275, 278 (3d Cir. 2013) (holding that "the ALJ did not err by concluding that the 569 jobs available as a surveillance system monitor" in Pennsylvania "was evidence of other work in significant numbers in the national economy"); *Kuntz v. Colvin*, No. 1:15-CV-00767-SHR-GBC, 2016 WL 6634942, at *12 (M.D. Pa. Sept. 30, 2016) (report and recommendation of magistrate judge concluding that there were sufficient jobs in the local economy that Plaintiff could perform given the VE's testimony that there were 200 surveillance system monitor jobs in the economy), *adopting report and recommendation*, 2016 WL 6599994, at *1 (M.D. Pa. Nov. 8, 2016).

Further, the number of jobs at issue—74,470—is large enough that it can reasonably be inferred that the jobs are not available only in isolated regions of the country. *See Gutierrez*, 740 F.3d at 529 (holding that the ALJ's finding that 25,000

jobs available nationally constituted work that existed in significant numbers in several regions of the country was supported by substantial evidence as is it not likely that 25,000 jobs available nationally would "fall into the category of 'isolated jobs" existing in 'very limited numbers'") (quoting 20 C.F.R. § 416.996(b)).

Moreover, given that the definition of work in the national economy is "work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country," 42 U.S.C. § 1382c(a)(3)(B), testimony "stating that there are a number of jobs available in the national economy is, by definition, stating the incidence of jobs 'in the region in which the individual resides or in several regions of the country.'" *Vititoe v. Colvin*, 549 F. App'x 723, 731 (10th Cir. 2013) (quoting 42 U.S.C. § 423(d)(2)(A), the definition applicable in the social security disability insurance context); *Adams-Skillings v. Colvin,* No. 1:12-CV-00084-DBP, 2013 WL 4434195, at *6 (D. Utah Aug. 14, 2013) ("The ALJ did not make a statement about pertinent jobs available to Plaintiff in the specific region where she resided.  However, he clearly stated Plaintiff could perform work in the 'national economy' . . . which by definition 'means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.' 42 U.S.C. § 423(d)(2)(A).  To this end, the

ALJ reasonably relied on the vocational expert's testimony that 57,900 jobs existed in the national economy for someone with Plaintiff's RFC.").

Thus, the VE's testimony that 74,470 surveillance system monitor jobs exist nationally that Ms. Brininger can perform supports the ALJ's conclusion that work exists in significant numbers in the national economy. In sum, the ALJ's decision that Ms. Brininger was not disabled within the meaning of the Social Security Act is supported by substantial evidence.

## VII.  Recommendations.

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that Ms. Brininger's request for relief be DENIED and the Commissioner's final decision denying Ms. Brininger's claim be AFFIRMED as follows:

1.      Final judgment should be entered in favor of the Commissioner and against Ms. Brininger;

2.      The clerk of court should close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and

all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted August 7, 2017.


*__S/Susan E. Schwab__*
Susan E. Schwab
Chief United States Magistrate Judge